UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRUCE TIZES,

Plaintiff,

v.

ANDELA, INC.,

Defendant.

25-CV-8481 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Plaintiff Bruce Tizes brings this action against his former employer Defendant Andela, Inc., asserting claims of unlawful retaliation pursuant to the Dodd-Frank Act's whistleblower protection provision (15 U.S.C. § 78u-6) and New York Labor Law § 740. Now before the Court are Defendant's motions to dismiss the Amended Complaint, to strike certain allegations contained therein, and to seal certain exhibits attached to its filings. For the reasons that follow, the motions to dismiss and to strike are denied, and the motions to seal are granted.

## BACKGROUND

The Court draws the following facts from the Amended Complaint, Dkt. 29 (the "Amended Complaint" or "Am. Compl."), accepting well-pleaded factual allegations as true for purposes of deciding this motion to dismiss, *Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020). Plaintiff Bruce Tizes is a physician, law school graduate, former hedge fund manager, and investor. Am. Compl. ¶¶ 1, 13. Defendant Andela, Inc. ("Andela") "is a technology services company that operates as a staffing agency intermediary marketplace for technical talent." *Id.* ¶ 14. It educates persons overseas to become IT technologists (called "Talent") and connects them to businesses located primarily in the United States. *Id.* In 2014, Tizes worked closely with Andela's co-founder

and former Chief Executive Officer ("CEO") Jeremy Johnson to build Andela, and served for six months as its first chief strategist. *Id.* ¶¶ 2, 36. He also invested in Andela's seed round. *Id.* ¶¶ 2, 39–40. Tizes rejoined Andela in June 2021 as Vice President Strategy ("VP Strategy"). *Id.* ¶ 53. In taking the job, he was "granted an option to purchase up to 150,000 shares of Andela stock," which would fully vest by August 1, 2026. *Id.* ¶ 54. He also "discussed" with Johnson—then CEO of Andela—"that he would be awarded additional option grants" going forward. *Id.* ¶ 55.

After Andela's former Chief Financial Officer ("CFO") resigned in the fall of 2021, Tizes assumed that role in December. As the interim CFO, he oversaw the Financial Planning & Analysis, Accounting, and Legal divisions and reported Andela's financial condition to its board. *Id.* ¶¶ 94, 98–101. Shortly after he became the interim CFO, Tizes says he "began to realize that Andela's Finance Department was in disarray," lacking reliable means to calculate key financial metrics such as cost of goods sold ("COGS") and gross revenue, and not following generally accepted accounting principles ("GAAP"). *Id.* ¶¶ 102–03. He alleges that over the course of 2022, he identified three "fraudulent practices" employed by Andela, the result of which was to "overstate its gross revenue, gross profit margin, and future expectancies." *Id.* ¶ 106.

First, Tizes claims that although Andela reported adopting the "ASC 606" standard as of January 1, 2020, it misclassified itself under it. *Id.* ¶¶ 108–09. Andela treated itself as a "principal" and recorded the full gross billable amounts to clients as revenue, which inflated its Annual Recurring Revenue ("ARR") and gross revenue figures. *Id.* ¶¶ 107, 109. According to Tizes, Andela should have instead reported its revenue on a net basis as an "agent," as the company "substantially functioned as an agent, acting as a staffing intermediary rather than a principal supplying service." *Id.* ¶ 107. This is because, beginning approximately in 2019, Andela shifted to an independent contractor model and "relinquished many controls" over the Talent. *Id.* ¶ 112.

Clients, instead of Andela, controlled how Talent performed their work and determined their payments. *Id.* ¶¶ 114–30.

Tizes alleges that Andela's choice to report its revenue on a gross basis—rather than the net margin—increased Andela's reported revenue by more than 200%, making it look like it was bringing in more than three times the revenue that it actually was. *Id.* ¶ 131. This practice also informed Andela's 2020 financial statements, 2021 409A valuations, and ARR projections, all of which were provided to its Series E investors. *Id.* ¶¶ 133–35. Tizes asserts that he repeatedly alerted others at Andela to these issues and urged Andela to report its revenue on a net basis, but the company was unwilling to do so and never corrected "its misstatements" to the Series E investors. *Id.* ¶¶ 136–39, 147–48.

Second, Tizes alleges that Andela "fictitiously recorded unearned revenue" by engaging in "soft launches" and "delayed churn tactics." *Id.* ¶¶ 152–59. Through "soft launches," Andela "prematurely" invoiced clients for an upcoming month's services and later credited those amounts back to them. *Id.* ¶¶ 151–52. And through "delayed churn," Andela convinced clients to delay contract termination by a month and later refunded them for that month's payment. *Id.* ¶¶ 153, 155. These tactics "artificially inflated" Andela's monthly revenue figures. *Id.* ¶ 157.

Third, Tizes claims that Andela deferred payroll expenses into subsequent periods. *Id.* ¶ 165. This practice allegedly violated GAAP and had the effect of understating COGS in the current period, thereby overstating gross profit. *Id.* ¶ 166. Tizes claims that "[b]y systematically delaying payroll expenses, Andela produced financial statements that did not reflect true operational costs and materially misled investors and other stakeholders." *Id.* ¶ 167. Deloitte—Andela's outside accounting firm—identified this practice as a "material weakness" in its 2021 and 2022 audits. *Id.* ¶ 169.

According to Tizes, these practices, taken together, overstated Andela's reported revenue and gross profit. *Id.* ¶ 170. He believed that Andela's 2019 and 2020 income statements, the forward-looking financial projections, and the 409A valuation from 2021—all of which were provided to Andela's Series E investors—made the company look significantly more valuable than it actually was. *Id.* ¶¶ 170, 172–73, 183, 188. "The misrepresentations were material," Tizes claims, and they "directly influenced investment decisions." *Id.* ¶ 189. Tizes alleges that he repeatedly reported these issues to Johnson and the board, and warned Johnson that Andela's gross profit margin would likely be significantly lower than the 43% referenced in the 2022 projections. Despite his urging, Andela never corrected those allegedly inaccurate reports. *Id.* ¶¶ 192, 198–202, 204–09, 222–24, 231–32, 234–36, 249–50, 254.

Around July 2022, while still the interim CFO, Tizes began overseeing Andela's efforts to acquire a company called Qualified. *Id.* ¶ 255. Andela hired a new permanent CFO in September 2022, after which Tizes returned to his position as VP Strategy, but remained responsible for the Qualified acquisition. *Id.* ¶¶ 246–47, 258. The deal was structured so that Andela would purchase Qualified with a combination of cash and equity in Andela; Andela's valuation was thus highly relevant in the deal. *Id.* ¶ 261. Tizes presented the potential acquisition to a subset of the board in December 2022 but did not refer to Andela's previous financial statements, which he believed to be inaccurate. *Id.* ¶¶ 264–65, 271–74. Even though Tizes had previously informed the board that updated accounting and financial projections based on revamped methodologies would not be available until January 2023, *id.* ¶¶ 227–30, 248, 268–70, board members still criticized Tizes's presentation for not including the existing financial reports, *id.* ¶¶ 271–75. Tizes alleges that one board member, Alex Finkelstein, "used foul and offensive language" and pressured Tizes to use historical financial statements and forecasts that Tizes believed to be false. *Id.* ¶ 271. Ultimately,

the new CFO presented the Qualified deal again to the board committee on January 17, 2023, using updated financial reports that Tizes did not help prepare. *Id.* ¶¶ 285–86. The deal closed in March 2023. *Id.* ¶ 287.

After the December 2022 board presentation, it became clear to Tizes that Andela's board would never correct the company's previous financial statements and forecasts provided to Series E investors, and that "Andela was at imminent risk for further securities fraud" in connection with the Qualified acquisition. *Id.* ¶¶ 290–91. Accordingly, on February 6, 2023, Tizes reported Andela's violations to the U.S. Securities and Exchange Commission (the "SEC") by submitting a "TCR form." *Id.* ¶¶ 293–94. In the form, he wrote, *inter alia*:

> Upon information and belief, Andela misstated gross profit margin, including in representations of gross profit margin to existing and potential investors, resulting in incorrect, misleading and/or incomplete statements about Andela's finances. . . . Upon information and belief, current and likely some past 409A valuations were based, in part, upon incorrectly reported financial performance and unreliable forecasts. Upon information and belief, Andela contemplates and has contemplated making acquisition(s) using cash and Andela equity, with Andela valuation based, at least in part, upon earlier completed series valuations and marketplace transactions.

*Id.* ¶ 296. On February 10, 2023, Tizes informed Johnson that he had made a report to the SEC. *Id.* ¶¶ 297, 300, 302. Immediately thereafter, Tizes was "excluded from meetings and isolated from others in Andela." *Id.* ¶¶ 309–10. By April 2023, after the Qualified deal closed, he was "excluded from decision-making and high-level meetings with the CEO and Andela's newly appointed Chief Business Officer." *Id.* ¶ 315. On April 27, 2023, Tizes received an email from Andela's in-house counsel, purporting to convert him to a part-time employee as of May 1, 2023, and then to terminate his employment as of December 31, 2023. *Id.* ¶ 317. The next day, he received another email from the in-house counsel, requiring him to sign a general release. *Id.* ¶ 318. He refused. *Id.* ¶ 320. On July 13, 2023, Andela officially terminated him without offering him a severance package. *Id.* ¶¶ 325–26. Tizes alleges that although Johnson told him that board

member Finkelstein had demanded his termination, it was Johnson who had actual authority to terminate employees and "made the ultimate decision to" terminate him. *Id.* ¶¶ 327–29. Tizes further asserts that on information and belief, Johnson informed the board at some point between February 2023 and Tizes's termination in July 2023 that Tizes had reported Andela to the SEC. *Id.* ¶ 330.

Tizes alleges that, until his termination, he had received exemplary performance reviews and was, on information and belief, the only employee who had received a full bonus at the end of 2022. *Id.* ¶¶ 337–57. On February 8, 2023, two days before he informed Johnson he had made a complaint to the SEC, Andela completed a form at Tizes's request for an outside mortgage lender. *Id.* ¶ 359. On the form, Andela indicated that Tizes had a "Probability of Continued Employment." *Id.* His "abrupt termination," Tizes alleges, "was because of his whistleblowing." *Id.* ¶ 335.

Tizes initiated this action on October 14, 2025, Dkt. 1. After Andela moved to dismiss the original complaint, Dkt. 15, Tizes filed the Amended Complaint on December 17, 2025. Now before the Court are Andela's motions to dismiss the Amended Complaint and to strike certain allegations contained therein, as well as its two motions to seal.

## DISCUSSION

### I. Motion to Dismiss

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a

[1] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, omissions, and alterations.

cause of action, supported by mere conclusory statements, do not suffice." *Id.* In deciding a motion to dismiss, the Court "constru[es] the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor," *Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)), although this "tenet . . . is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

**A. Consideration of the Exhibits in Support of the Motion to Dismiss**

As an initial matter, the Court must decide whether to consider the exhibits submitted in support of the motion to dismiss. Andela submitted fourteen exhibits and asked the Court to consider them as incorporated into the Amended Complaint for the purposes of resolving the motion, which Tizes opposes. A "complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152–53. But "limited quotation does not constitute incorporation by reference." *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985). Rather, "[t]o be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019) (quoting *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010)).

To be sure, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers*, 282 F.3d at 152–53. "Merely mentioning a document in the complaint," however, "will not satisfy this standard; indeed, even offering limited quotations from the document is not enough." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). Rather, in determining whether a document is integral to a complaint, a court will consider

whether the contents of the document "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff] is entitled to relief.'" *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)). "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Glob. Network Commc'ns., Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Exhibits 1 and 8 are excerpts from Andela's 2021 and 2022 year-end reviews for Tizes. Tizes quotes from both exhibits at length in the Amended Complaint and relies upon them to argue that he had received exemplary reviews, which supports the inference that his later demotion and termination were due to his report to the SEC. *See* Am. Compl. ¶¶ 203, 335–56, 360. The Court will therefore consider Exhibits 1 and 8 in resolving the motion. The remaining exhibits, however, are only mentioned or quoted briefly in the Amended Complaint, and are neither incorporated "by reference" nor "integral" to it. The Court thus will not consider them at this stage.

### B. The Dodd-Frank Retaliation Claim

To successfully plead a retaliation claim under the Dodd-Frank Act, a plaintiff must plead "(1) that [he] engaged in a protected activity, (2) that [he] suffered an adverse employment action, and (3) that the adverse action was causally connected to the protected activity." *Rimini v. J.P. Morgan Chase & Co.*, 2024 WL 4354875, at *7 (S.D.N.Y. Sept. 30, 2024) (citing *Ott v. Fred Alger Mgmt., Inc.*, 2012 WL 4767200, at *4 (S.D.N.Y. Sept. 27, 2012)). Andela challenges whether the first and the third prongs of this test have been met.

**1. Protected Activity**

Andela first argues that the Amended Complaint does not plausibly allege protected activity because the TCR form Tizes submitted to the SEC does not "detail why the acts described constitute a violation of the federal securities laws" and "misses the critical elements of securities fraud." Dkt. 35 ("Mot.") at 13 (internal quotation marks and citation omitted). The Court disagrees. The Dodd-Frank Act protects a "whistleblower" who provides "information relating to a violation of the securities laws to the [SEC], in a manner established, by rule or regulation, by the [SEC]." 15 U.S.C. § 78u-6(a)(6). Pursuant to the relevant regulation, an individual qualifies as a whistleblower if he provides the SEC "with information in writing that relates to a possible violation of the federal securities laws (including any law, rule, or regulation subject to the jurisdiction of the [SEC]) that has occurred, is ongoing, or is about to occur." 17 C.F.R. § 240.21F-2(a)(1).

Tizes did exactly what the statute and the regulation require him to do. In his TCR form, he provided the SEC with information in writing indicating that Andela "misstated gross profit margin, including in representations of gross profit margin to existing and potential investors," that its 409A valuations "were based, in part, upon incorrectly reported financial performance and unreliable forecasts," and that the company "contemplates and has contemplated" acquisitions with its valuation based, at least in part, on these valuations. Am. Compl. ¶ 296. As alleged in the Amended Complaint, this information "relate[d] to a possible violation of the federal securities laws," *id.* ¶ 373; 17 C.F.R. § 240.21F-2(a)(1), because Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "to use or employ, in connection with the purchase or sale of . . . any security . . . any manipulative or deceptive device," 15 U.S.C. § 78j(b). Andela's alleged practices also relate to a possible violation of a "regulation subject to the jurisdiction of the

[SEC]"—17 C.F.R. § 240.10b-5—which makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading . . . in connection with the purchase or sale of any security." The alleged misstatements to Andela's Series E investors, together with the alleged attempt to use an inflated valuation in the equity-financed acquisition of Qualified, thus relate to possible violations of Section 10(b) and Rule 10b-5.

Andela maintains that Tizes's TCR report was lacking because it did not state that Andela's misstatements were "material" or "intended to mislead investors." Mot. at 13. But nothing in the Dodd-Frank Act requires a whistleblower to specifically identify or establish all the elements of securities fraud. *See Kuhns v. Ledger*, 202 F. Supp. 3d 433, 439 (S.D.N.Y. 2016) (denying motion to dismiss Dodd-Frank claim and holding that plaintiff does not need to "definitively and specifically" assert that "one of the varieties of fraud enumerated in Section 1514A had taken place") (quoting *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2d Cir. 2014)). Indeed, a plaintiff "is not required to prove that a securities law violation had occurred, but only that he possessed a good faith reasonable belief that such a violation had occurred." *Williams v. Rosenblatt Sec. Inc.*, 136 F. Supp. 3d 593, 605 (S.D.N.Y. 2015), *opinion reinstated on reconsideration*, 2015 WL 6509112 (S.D.N.Y. Oct. 28, 2015).

Andela next argues that Tizes did not reasonably believe that the issues he reported constituted violations of securities laws and regulations. This argument, too, fails. "To be covered by the anti-retaliation provision of the Dodd–Frank Act, an individual must possess a reasonable belief that the information [he is] providing [to the SEC] relates to a possible securities law violation." *Ott*, 2012 WL 4767200, at *4. "The 'reasonable belief' standard contains both subjective and objective components: a plaintiff 'must show not only that he believed that the

conduct constituted a violation, but also that a reasonable person in his position would have believed that the conduct constituted a violation.'" *Lawrence v. Int'l Bus. Mach. Corp.*, 2017 WL 3278917, at *10 (S.D.N.Y. Aug. 1, 2017) (quoting *Nielsen*, 762 F.3d at 221 (analyzing 18 U.S.C. § 1514A(a)(1))).

Tizes plausibly pleads that his belief was objectively reasonable. He identifies three ways in which Andela engaged in fraudulent practices by alleging that Andela (1) misclassified itself as a principal and reported gross revenues when it should have reported revenues on a net basis, (2) artificially inflated revenue on a monthly basis by engaging in "soft launches" and "delayed churn practices," and (3) delayed recognition of current-month payroll expenses and thus understated COGS. Am. Compl. ¶¶ 107–69. He also explains how these practices, combined, overstated Andela's revenue, understated its expenses, and exaggerated its profit. *Id.* ¶¶ 170–71. Importantly, Tizes alleges that these practices resulted in Andela providing inaccurate financial statements, projections, and, ultimately, company valuations to its Series E investors and Qualified. *Id.* ¶¶ 173, 279, 373. These allegations support the reasonableness of his belief that the tactics purportedly utilized constituted a "possible violation" of securities laws and regulations.

Andela disputes each of these claims, arguing that its conduct was either legitimate or resulted only in an "immaterial error." Mot. at 15–21. These disputes are, however, at their core, factual in nature and cannot be resolved at the motion to dismiss stage. Tizes plausibly alleges that Andela "lied to investors regarding the company's valuation and its prospects," and such allegations "are sufficient to survive a 12(b)(6) motion." *Kuhns*, 202 F. Supp. 3d at 439; *cf. Ashmore v. CGI Grp. Inc.*, 138 F. Supp. 3d 329, 342 (S.D.N.Y. 2015) ("To the extent that Defendants seek to disprove the existence of the shell company scheme in order to challenge the reasonableness of Plaintiff's belief, that turns on factual questions that cannot be resolved at this

stage.").

Tizes also plausibly pleads that he subjectively held that belief. He alleges that he repeatedly reported what he perceived to be fraudulent practices to both CEO Johnson and the board. Am. Compl. ¶¶ 136–39, 147–48. Because Tizes "told [the CEO] on multiple occasions to cease [the company's] fraudulent behavior," he "clearly sufficiently alleges a subjective belief" that Andela's practices "constituted securities fraud." *Kuhns*, 202 F. Supp. 3d at 439.

**2. Causation**

Andela next argues that the Amended Complaint fails to allege that the adverse employment action was causally connected to the protected activity. This argument fails as well. Tizes alleges that he informed Johnson about his complaint to the SEC on February 10, 2023, and that on April 27, 2023, Andela notified him that it intended to convert him to a part-time employee as of May 1, 2023, and then terminate his employment on December 31, 2023. Am. Compl. ¶¶ 300, 302, 317. Until then, Tizes claims to have been receiving exemplary reviews; indeed, he was, on information and belief, "the only [Andela] employee to receive his full bonus at the end of 2022." *Id.* ¶¶ 336–54, 357. Tizes further alleges that "immediately" after he told Johnson about his report to the SEC, he was "excluded from meetings and isolated from others in Andela." *Id.* ¶¶ 309–10. These allegations, taken together, plausibly support an inference of causation.[2]

Andela's reliance on cases suggesting that a gap of more than two months between protected activity and an adverse employment action defeats an inference of causation is misplaced. *See* Mot. at 24; Dkt. 47 ("Reply") at 11. To begin with, Tizes alleges that Andela's retaliation began "immediately" after Johnson learned about his report to the SEC, Am. Compl. ¶¶ 309–10,

[2] Although Andela is correct that the Amended Complaint does not specify whether or when board member Finkelstein learned of Tizes's TCR report, Mot. at 24, that is not fatal to Tizes's claim. Andela does not dispute that the April 2023 email from in-house counsel constitutes an adverse employment action. Moreover, Tizes alleges that Johnson knew of the report and made the ultimate decision to terminate him. *See* Am. Compl. ¶¶ 302, 328–29.

even if notice of his intended demotion and termination came months later. *See Santana v. Latino Express Rests., Inc.*, 198 F. Supp. 3d 285, 297 (S.D.N.Y. 2016) ("The fact that [Defendant's] significant change in behavior toward Plaintiff occurred almost immediately after her complaint to [Defendant's] wife supports the existence of a causal link between her engaging in a protected activity and the alleged adverse employment actions that she suffered.").

Moreover, most of the cases Andela cites were decided at the summary judgment stage and involved plaintiffs who "relie[d] entirely on the temporal proximity" between the protected activity and the adverse action to establish causation. *Fraser v. Fiduciary Tr. Co. Int'l*, 2009 WL 2601389, at *6 (S.D.N.Y. Aug. 25, 2009), *aff'd*, 396 F. App'x 734 (2d Cir. 2010); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (explaining, on summary judgment, that when "mere temporal proximity" is relied upon as sufficient evidence of causation, the temporal proximity must be "very close"). Tizes, by contrast, does not rely solely on temporal proximity to allege causation. He also alleges that he had been receiving exemplary performance reviews until his SEC report, Am. Compl. ¶¶ 336–54, 357, which further supports the inference that the adverse employment actions against him were caused not by his performance but by his protected activity. *See Marciniszyn v. PerkinElmer Inc.*, 2018 WL 8729590, at *10 (D. Conn. Mar. 27, 2018) ("An eleven-month period is near the outer limits for showing causation based on temporal proximity. However, the existence of a causal connection between the plaintiff's protected activity and the termination of his employment is also supported by the plaintiff being fired despite his positive performance record.").

In any event, the Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord*,

558 F.3d 119, 129 (2d Cir. 2009) (analyzing First Amendment retaliation claim). Rather, courts assess "the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Id.* Conducting that context-specific inquiry, courts have inferred causation from even longer intervals between protected activity and adverse employment action. In *Pabon v. Barclays Bank PLC*, for example, the court denied a motion to dismiss where there was a four-month interval between plaintiffs' last alleged protected conduct and defendants' alleged retaliatory action, noting that "defendants may have had good reason for waiting." 2015 WL 5834796, at *3 (S.D.N.Y. Sept. 30, 2015). Similarly, here, Tizes plausibly alleges that Andela may have had good reason for waiting as he was leading the Qualified deal, which was set to close in March 2023. Am. Compl. ¶ 311. The Court thus finds that Tizes plausibly alleges causation.

### C. Claim Under New York Labor Law

Andela moves to dismiss Tizes's claim under New York Labor Law for the same reasons, as well as on the ground that the Court should decline to exercise supplemental jurisdiction over it if Tizes's federal claim is dismissed. Mot. at 27. Because the Court denies Andela's motion to dismiss Tizes's retaliation claim under the Dodd-Frank Act, the Court continues to exercise supplemental jurisdiction over the New York Labor Law claim at this time and denies the motion to dismiss that claim for the same reasons stated above.

## II. Motion to Strike

Andela next moves to strike paragraphs 239–44 from the Amended Complaint, arguing that they purport to reveal privileged attorney-client communications. Dkt. 32 ("Mot. to Strike") at 2. Federal Rule of Civil Procedure 12(f) provides that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Federal courts have discretion in deciding whether to grant motions to strike." *Capri*

*Sun GmbH v. Am. Bev. Corp.*, 414 F. Supp. 3d 414, 423 (S.D.N.Y. 2019). "Generally, motions to strike are viewed with disfavor and infrequently granted." *In re Merrill Lynch & Co., Inc. Rsch. Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003). "[I]t is settled that the motion will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

Paragraphs 239–44 of the Amended Complaint allege that Tizes and Andela's in-house securities counsel discussed deficiencies in the company's financial reporting and agreed that a fraud risk assessment was necessary. Am. Compl. ¶¶ 239–44. "A party invoking the attorney-client privilege must show (1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir. 2007). Andela fails to make such a showing here as it has not demonstrated that Tizes's communication with Andela's in-house counsel "was intended to be and was in fact kept confidential." *Ambrose v. City of White Plains*, 2011 WL 13290651, at *4 (S.D.N.Y. Sept. 30, 2011) (collecting cases). The Court is thus "without sufficient information at this time to make a factual or legal determination on the issue[] of privilege." *Stallings-Rodriguez v. Cnty. of Nassau*, 2008 WL 11449241, at *3 (E.D.N.Y. June 23, 2008). Accordingly, and because the Court is not relying on these paragraphs in deciding Andela's motion to dismiss, the motion to strike is denied at this time, albeit without prejudice to renew.

### III. Motions to Seal

Lastly, Andela has also filed two letter motions to seal certain exhibits it submitted in support of its motions to dismiss. "Federal courts employ two related but distinct presumptions in favor of public access to court proceedings and records: a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." *Newsday LLC v. Cnty. of*

*Nassau*, 730 F.3d 156, 163 (2d Cir. 2013). "The common law right of public access turns on whether the document at issue is a judicial document." *United States v. Greenwood*, 145 F.4th 248, 254 (2d Cir. 2025). "In order to be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). Once a document is deemed a judicial document, "the court must determine the weight of the common law presumption of access based on 'the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts.'" *Greenwood*, 145 F.4th at 254 (quoting *Lugosch*, 435 F.3d at 119). "[A]fter determining the weight of the presumption of access, the court must balance competing considerations against it," such as "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120.

A qualified First Amendment right of access also attaches to certain judicial documents. "To determine whether the First Amendment right of access attaches to a judicial document," the Court "considers the extent to which the judicial documents are derived from or are a necessary corollary of the capacity to attend the relevant proceedings." *Greenwood*, 145 F.4th at 255. If the First Amendment right attaches, documents may still be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Lugosch*, 435 F.3d at 120 (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

Andela's first motion seeks to seal Exhibits 3 and 9 attached to the first Rotenberg Declaration in support of its motion to dismiss the original complaint, *see* Dkt. 14 ("1st Mot. to Seal"); Dkt. 18 (the "first Rotenberg Declaration"), while its second motion seeks to seal Exhibits

2, 4, and 11 attached to the second Rotenberg Declaration in support of its motion to dismiss the Amended Complaint, *see* Dkt. 33 ("2nd Mot. to Seal"); Dkt. 38 (the "second Rotenberg Declaration"). Exhibits 3 and 9 to the first Rotenberg Declaration are the same documents as Exhibits 4 and 11 to the second Rotenberg Declaration. Accordingly, the Court addresses the motions to seal in tandem.

The exhibits Andela seeks to seal are as follows: Exhibit 2 to the second Rotenberg Declaration ("Exhibit 2"), which contains an April 2022 financial analysis of Andela prepared by SoftBank; Exhibit 3 to the first Rotenberg Declaration and Exhibit 4 to the second Rotenberg Declaration ("Exhibit 3/4"), which consist of an excerpt of Deloitte's October 26, 2022 "Report to the Audit Committee and Management"; and Exhibit 9 to the first Rotenberg Declaration and Exhibit 11 to the second Rotenberg Declaration ("Exhibit 9/11"), which consist of an excerpt of Andela's June 30, 2022 409A Valuation. As a threshold matter, "it is not even clear that the exhibits at issue qualify as 'judicial documents' to which a presumption of access would attach" because they "were beyond the scope of what the Court could properly consider in evaluating [Andela's] motion to dismiss." *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, 2017 WL 5151357, at *2 (S.D.N.Y. Nov. 3, 2017); *see supra* I.A. *Compare City of Almaty, Kaz. v. Ablyazov*, 2019 WL 4747654, at *5 (S.D.N.Y. Sept. 30, 2019) ("Documents submitted in support or opposition to a motion to dismiss are judicial documents."), *with In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 2013 WL 3531600, at *2 (S.D.N.Y. July 12, 2013) ("[D]ocuments attached to a motion to dismiss under Rule 12(b)(6) are not 'judicial documents' if they may not be properly considered by the court in resolving the motion . . . .").

In any event, any presumption in favor of public access would be overcome here, as the Court agrees with Andela that Exhibits 2 and 9/11—SoftBank's financial analysis of Andela and

Andela's 409A valuation—contain detailed financial information concerning a privately held business, not previously disclosed to the public, the disclosure of which "may provide valuable insights into a company's current business practices that a competitor [might] seek to exploit." *Subramanian v. Lupin Inc.*, 2020 WL 5801445, at *1 (S.D.N.Y. Sept. 29, 2020) (granting motion to seal); *see also Closed Joint Stock Co. "CTC Network" v. Actava TV, Inc.*, 2016 WL 1364942, at *4 (S.D.N.Y. Mar. 28, 2016) ("[D]etailed financial information concerning a privately held business, not previously disclosed to the public, will in most cases warrant confidential treatment."). The Court further finds that Exhibit 3/4, which consists of an excerpt of Deloitte's auditing report, contains "commercially sensitive information" that likewise warrants sealing. *See Lazaar v. Anthem Cos., Inc.*, 2025 WL 2773944, at *12 (S.D.N.Y. Sept. 29, 2025) (granting motion to seal defendant's audits). Courts "routinely permit parties to seal or redact commercially sensitive information in order to protect confidential business and financial information." *In re B & C KB Holding GmbH*, 2023 WL 2021299, at *1 (S.D.N.Y. Feb. 14, 2023) (collecting cases). Accordingly, both of Andela's letter motions to seal are granted.

**CONCLUSION**

For the reasons stated above, Defendant's motion to dismiss the Amended Complaint is denied, its motion to strike is denied without prejudice, and its letter motions to seal are granted. In light of Plaintiff's filing of the Amended Complaint, Defendant's motion to dismiss the original complaint is denied as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 14, 15, 31, 33, and 34.

Dated: September 30, 2026
New York, New York

Ronnie Abrams
United States District Judge